## UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **TONY DIXON, B-15849,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | **Case No. 3:16-cv-01222-GCS** |
| **CHRISTINE BROWN, VIPIN SHAH,** | ) | |
| **JAMES BLADES, THOMAS SPILLER,** | ) | |
| **JACQULINE LASHBROOK, LOUIS** | ) | |
| **SHICKER, MICHAEL DEMPSEY,** | ) | |
| **STEPHEN MEEKS, MICHAEL** | ) | |
| **SCOTT, ROBERT JEFFREYS, and** | ) | |
| **WEXFORD HEALTH SOURCES,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM & ORDER

**SISON, Magistrate Judge:**

#### INTRODUCTION AND BACKGROUND

Between 2014 and 2018, Plaintiff Tony Dixon was an inmate in the custody of the Illinois Department of Corrections ("IDOC"). (Doc. 198). Prior to his incarceration, Plaintiff received a full orthotropic heart transplant, which required him to take immunosuppressant medications to prevent his body's rejection of the new heart. (Doc. 73). Plaintiff also suffers from hyperkalemia (high potassium), chronic kidney disease, chronic obstructive pulmonary disease ("COPD"), high blood pressure, constipation, type two diabetes, high cholesterol, renal osteodystrophy, and gout. *Id.* These ailments require Plaintiff to take various medications and consume a renal diet. *Id.*

On February 14, 2014, Plaintiff entered Pinckneyville Correctional Center ("Pinckneyville"). (Doc. 73). However, because Plaintiff was involved in a pending criminal case, he was regularly transported between Pinckneyville and the Northern Reception and Classification Center ("NRC") for required court appearances. *Id.* In addition to these transfers, Plaintiff was also housed at the NRC on a writ from October 29, 2014 through February 4, 2015. *Id.*

Plaintiff filed suit against numerous defendants pursuant to 42 U.S.C. § 1983 on April 25, 2016. (Doc. 1). Specifically, Plaintiff claims that the defendants repeatedly failed to provide him with the medical treatment and medication necessary to care for his heart transplant, heart disease, and kidney disease. (Doc. 73). According to Plaintiff, these failures resulted in multiple medical complications which culminated in combined cardiogenic shock and acute renal failure, the treatment of which required a 16-day hospital stay. *Id.*

On March 29, 2019, the Court granted in part and denied in part a motion for summary judgment on the issue of Plaintiff's exhaustion of administrative remedies. (Doc. 127). After summary judgment, the remaining defendants include: (i) Defendant Wexford Health Sources, Inc. ("Wexford"); (ii) Defendants Shah and Scott, both employees of Defendant Wexford and physicians during the time period underlying the events of Plaintiff's complaint (the "Wexford Defendants"); (iii) Defendant Shicker, the IDOC Medical Director prior to June 2016; Defendant Dempsey, the IDOC Medical Director between June and November 2016; and Defendant Meeks, the current IDOC Medical Director ('the "Medical Director Defendants"); (iv) Defendant Spiller, the

warden of Pinckneyville prior to July 2015; and Defendant Lashbrook, the warden of Pinckneyville after July 2015 (the "Warden Defendants"); (v) Defendant Jeffreys,[1] the current director of IDOC; and Defendant John Baldwin, the former director of IDOC at the time of the events underlying Plaintiff's complaint (the "IDOC Director Defendants"); (vi) Defendant Brown, the Health Care Unit Administrator at all times relevant to the complaint; and (vii) Defendant Blades, a lieutenant at Pinckneyville at all times relevant to the complaint. *Id.* at p. 2-4.

Four counts in Plaintiff's amended complaint survived summary judgment. *See* (Doc. 127). In Count I, Plaintiff alleges that the Wexford Defendants, the Warden Defendants, and Defendants Brown and Blades were deliberately indifferent to Plaintiff's serious medical needs in violation of the Eighth Amendment. *Id.* at p. 3. Plaintiff asserts that the Wexford Defendants, Warden Defendants, and Defendant Brown failed to provide him with continuous and timely access to his required medications. *Id.* Plaintiff additionally claims that Defendant Shah, the Warden Defendants, and Defendant Brown were deliberately indifferent in violation of the Eighth Amendment by failing to provide Plaintiff with a low-cholesterol, renal diet. *Id.* Furthermore, Plaintiff argues that Defendant Shah, Defendant Spiller, and Defendant Brown demonstrated deliberate indifference by failing to (i) monitor and control his medical issues; or (ii) coordinate with

---

[1] Plaintiff's amended complaint names former IDOC director John Baldwin as a defendant in his official and individual capacity. (Doc. 73, p. 3). However, Defendant Jeffreys is the current acting director of the IDOC. Pursuant to Federal Rule of Civil Procedure 25, a suit does not abate when a party in an official capacity ceases to hold office while the action is pending, but the officer's successor is automatically substituted as a party. *See* FED. R. CIV. PROC. 25(d). Accordingly, the Court substitutes Defendant Jeffreys for Defendant Baldwin as it pertains to the claims against Defendant Baldwin in his official capacity only.

outside physicians to provide care for his medical issues. *Id.* He also states that Defendant Shah, the Warden Defendants, and Defendant Brown failed to communicate and coordinate with the NRC during his transfers to ensure he received his medications. *Id.* Finally, Plaintiff alleges that Defendants Shah, Lashbrook, and Blades failed to provide him access to the physically challenged gym. *Id.*

In Count II, Plaintiff claims that Defendant Wexford, the IDOC Director Defendants, and the Medical Director Defendants violated his Eighth Amendment rights because they had notice and knowledge of failures in the medical system for prisoners transferred to the NRC but failed to take reasonable measures to protect him from harm. (Doc. 127, p. 4). Instead, the defendants continued to allow certain policies and practices to continue. *Id.* These practices and polices included failing to ensure that prisoners have continuous and timely access to required medication and failing to ensure that prisoners transferred between Pinckneyville and the NRC were provided uninterrupted medical care. *Id.*

Finally, Counts III and IV, respectively, allege that the IDOC Director Defendants, in their official capacities, and Defendants Blades and Lashbrook failed to provide Plaintiff with reasonable accommodations in violation of the Americans with Disabilities Act, 24 U.S.C. § 12101, *et seq*, and the Rehabilitation Act, 29 U.S.C. § 794. (Doc. 127). Plaintiff asserts that these Defendants denied him access to the physically challenged gym at Pinckneyville. *Id.*

Now before the Court is the motion for summary judgment by the IDOC Director Defendants, Medical Director Defendants, Warden Defendants, and Defendants Blades

and Brown (Doc. 197), as well as the motion for summary judgment by the Wexford Defendants. (Doc. 192). For the reasons outlined below, the motion for summary judgment is **GRANTED in part and DENIED in part.**

### FACTUAL ANALYSIS

Several years prior to Plaintiff's incarceration, he received a heart transplant. (Doc. 193, p. 3). In order to ensure that his body does not reject his new heart, Plaintiff is required to take two anti-rejection medications, Prograf and CellCept, twice daily. (Doc. 213, p. 14.). Plaintiff also suffers from a variety of other interrelated diseases, including hyperkalemia, chronic kidney disease, COPD, constipation, type II diabetes, hypertension, hyperlipidemia, renal osteodystrophy, and gout. *Id.* at p. 13.

Beginning in January 2014, Plaintiff was housed in the NRC. (Doc. 213, p. 18). Plaintiff was then housed at Pinckneyville between February 14, 2014 and September 8, 2016. (Doc. 198, p. 3). Plaintiff claims that, for the first five days in which he was housed in the NRC, he did not receive his required doses of Prograf. (Doc. 213, p. 18). When Plaintiff was transferred to Pinckneyville, he again missed doses of both medications as his transfer paperwork from the NRC had crossed off Prograf and did not list CellCept, which suggested he did not receive those medications. *Id.* at p. 18-19. Plaintiff's medical administration records, in which administrators were to circle when they provided Plaintiff with his medications, also included missing dates in February 2014 indicating that Plaintiff did not receive his medications during some dates that month. *Id.* at p. 19. Plaintiff also states that he did not receive CellCept for at least six days in March 2014. *Id.*

In March 2014, after missing his doses of CellCept, Plaintiff filed an emergency grievance requesting examination by an outside cardiologist and stating that he did not receive his anti-rejection medication. (Doc. 213, p. 19). Defendant Spiller reviewed Plaintiff's grievance and deemed it a non-emergency because the period in which Plaintiff claimed he had not received his medication had already ended. *Id*. He then took no further action to investigate Plaintiff's claims. *Id*. at p. 20.

Between April 2014 and March 2015, Plaintiff was again transferred between the NRC and Pinckneyville on a court writ for a court appearance in a separate criminal matter. (Doc. 213, p. 20). However, the NRC was limited in its ability to care for inmates transferred on writ. *Id*. Inmates on writ were classified as belonging to another institution, and the NRC would not oversee or take over the management of any inmate on a writ. *Id*. Moreover, Pinckneyville would only send a one-page, handwritten "health transfer summary" with an inmate rather than sending the inmate's medical chart. *Id*. This policy was maintained for at least twenty-four years. *Id*. While housed at the NRC, Plaintiff again missed doses of his medications; Plaintiff again submitted grievances to that effect. *Id*. at p. 21.

During one period of transfer between the NRC and Pinckneyville in August 2014, Pinckneyville officials confiscated Plaintiff's medications in order to inventory them. (Doc. 213, p. 21). Plaintiff was not given his medications for two days following the confiscation. *Id*. When officials did return his medications, they did not provide refills. *Id*. During this time, Plaintiff sent Defendant Shah three medical slips requesting that his

medication be refilled. *Id*. Plaintiff again missed doses of his medication in September 2014.

When Plaintiff was transferred back to the NRC in October 2014, Plaintiff was sent without his medications. (Doc. 213, p. 22). Prior to Plaintiff's transfer, Defendant Shah noted: "Medication issue. Going out in a.m. missing a.m. medication." *Id*. Though Plaintiff received some of his medications three weeks later, officials still failed to bring three of Plaintiff's medications. *Id*. at p. 23. Plaintiff continued to submit grievances regarding his missing medications. *Id*.

Plaintiff again stayed at the NRC in March 2015; however, during his transfer, Pinckneyville again failed to send Plaintiff with his medications. (Doc. 213, p. 24). Though Plaintiff filed an emergency grievance, Defendant Spiller denied this grievance as a non-emergency. *Id*. at p. 25. During his deposition, Defendant Spiller admitted that he based this designation on his own opinion and did not investigate this matter by talking to Plaintiff's doctors, reviewing Plaintiff's medical chart, or looking at any of Plaintiff's prior grievances. *Id*. Plaintiff also "took every opportunity" to talk to Defendant Shah about his missing medications during this time, including by speaking to him personally when he saw Defendant Shah on walks. *Id*.

Defendant Scott replaced Defendant Shah as Plaintiff's treatment provider in January 2016. (Doc. 213, p. 26). When Plaintiff saw Defendant Scott, Plaintiff told him about his missed medications. *Id*. Defendant Scott promised that Plaintiff would not miss any more medications. *Id*. However, Plaintiff again missed doses of his medications in January, February, May, and June 2016. *Id*.

Plaintiff also claims that Defendant Shah failed to treat his hypertension appropriately. (Doc. 213, p. 28). During his incarceration, Plaintiff's blood pressure regularly measured in the 130s/80s. *Id*. Plaintiff's outside doctors recommended he be placed on Hydralazine, a blood pressure medication, twice daily. *Id*. at p. 54. Defendant Shah also ordered Plaintiff to take Hydralazine, as well as to continue with his current medications. *Id*. at p. 28.  However, in April 2015, Plaintiff was only given enough Hydralazine to take the required dose once daily. *Id*. at p. 54. Plaintiff grieved this problem in May, and the problem was resolved in June 2015. *Id*.

According to Plaintiff, Defendant Shah also failed to treat his hyperkalemia by prescribing him a low-potassium diet. (Doc. 213, p. 28). Shortly after Plaintiff began his incarceration in February 2014, he was hospitalized with dangerously high levels of potassium in his blood. *Id*. When Plaintiff was released from the hospital, his discharge instructions explicitly required he be placed on a low-potassium diet. *Id*. at p. 29. Furthermore, Wexford's renal teleclinic nephrologist also recommended that Plaintiff be placed on a low-potassium diet in October 2014. *Id*. at p. 30. However, Defendant Shah insisted that Plaintiff instead be placed on a regular diet throughout his incarceration. *Id*.

Plaintiff claims that, in addition to writing grievances, he personally discussed his treatment and medication issues with Defendants Spiller and Lashbrook. (Doc. 213, p. 32). Defendant Brown also reviewed each of Plaintiff's grievances and provided responses from the health care unit. *Id*.

LEGAL STANDARDS

Summary judgment is proper when the pleadings and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. PROC. 56(c); *Oates v. Discovery Zone*, 116 F.3d 1161, 1165 (7th Cir. 1997)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The movant bears the burden of establishing the absence of a genuine issue as to any material fact and entitlement to judgment as a matter of law. *See Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997)(citing *Celotex*, 477 U.S. at 323). This Court must consider the entire record, drawing reasonable inferences and resolving factual disputes in favor of the non-movant. *See Regensburger v. China Adoption Consultants, Ltd.*, 138 F.3d 1201, 1205 (7th Cir. 1998)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). *See also Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009)(stating that "we are not required to draw every conceivable inference from the record . . . we draw only reasonable inferences") (internal citations omitted). Summary judgment is also appropriate if a plaintiff cannot make a showing of an essential element of his claim. *See Celotex*, 477 U.S. at 322. While the Court may not "weigh evidence or engage in fact-finding[,]" it must determine if a genuine issue remains for trial. *Lewis v. City of Chicago*, 496 F.3d 645, 651 (7th Cir. 2007).

In response to a motion for summary judgment, the non-movant may not simply rest on the allegations in his pleadings; rather, he must show through specific evidence that an issue of fact remains on matters for which he bears the burden of proof at trial. *See Walker v. Shansky*, 28 F.3d 666, 670–671 (7th Cir. 1994), aff'd, 51 F.3d 276 (citing *Celotex*, 477 U.S. at 324). No issue remains for trial "unless there is sufficient evidence favoring

the non-moving party for a jury to return a verdict for that party . . . if the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–250 (citations omitted). *Accord Starzenski v. City of Elkhart*, 87 F.3d 872, 880 (7th Cir. 1996); *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 178 (7th Cir. 1994). In other words, "inferences relying on mere speculation or conjecture will not suffice." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009) (internal citation omitted). *See also Anderson*, 477 U.S. at 252 (finding that "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]"). Instead, the non-moving party must present "definite, competent evidence to rebut the [summary judgment] motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (internal citation omitted).

## ANALYSIS

Plaintiff has voluntarily dropped his claims against Defendant Blades. (Doc. 213, p. 94). Accordingly, the Court grants the motion for summary judgment in favor of Defendant Blades in Counts I, III and IV. Plaintiff has additionally dropped Counts III and IV of his complaint. *Id*. The Court therefore grants summary judgment on Counts III and IV. The counts remaining before the Court are therefore only Counts I and II. The Warden Defendants, IDOC Director Defendants, Medical Director Defendants, and Defendant Brown also assert that they are immune from liability under the Eleventh Amendment and the doctrine of qualified immunity. (Doc. 198, p. 32-36)*.

I.      **Whether the IDOC Director Defendants, Medical Director Defendants,
        Warden Defendants, and Defendant Brown, in their Official Capacities, are
        Entitled to Summary Judgment on Claims for Money Damages**

The Supreme Court has consistently held that under the Eleventh Amendment to

the United States Constitution, "an unconsenting state is immune from suits brought in

federal courts by her own citizens as well as by citizens of another State." *Edelman v.*

*Jordan*, 415 U.S. 651, 662-663 (1974), overruled on other grounds by *Lapides v. Board of*

*Regents of the University System of Georgia*, 535 U.S. 613 (2002)(citing cases). However, in

some cases, a state may waive the Eleventh Amendment's protections from suit, or

Congress may exercise its powers under the Fourteenth Amendment to abrogate the

states' immunity under the amendment. *See MSA Realty Corp. v. Illinois*, 990 F.2d 288, 291

(7th Cir. 1993). Eleventh Amendment immunity applies to all suits, regardless of the type

of redress sought. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

Nevertheless, the Supreme Court identified limited circumstances in which suits against

state officials could proceed in *Ex Parte Young*, 209 U.S. 123 (1908).

Under the *Young* doctrine, a plaintiff may sue a state officer in their official

capacity for injunctive relief because when an official violates federal law, that official

acts outside the scope of their authority and is no longer entitled to immunity. *See*

*Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002)(citing *Dean Foods Co. v. Brancel*,

187 F.3d 609, 613 (7th Cir. 1999)). This "legal fiction" therefore allows federal courts to

vindicate federal rights while holding state officials accountable for unlawful actions. *Id.*

(citing *MCI Telecomm. Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 345 (7th Cir.2000)).

Therefore, under the *Young* doctrine, state officials may be sued in their official capacities

for injunctive relief but may not be sued for money damages. *See MSA Realty Corp.*, 990 F.2d at 291.

Although the Eleventh Amendment protects state officials from suit for money damages in their official capacity, it does not protect those official from suit in their individual capacity. Suits against state officials in their individual capacity "do not seek to conform the State's conduct to federal law;" instead, such suits seek recovery from a defendant personally. *Ameritech Corp*, 297 F.3d at 586 (citing *Alden v. Maine,* 527 U.S. 706, 757 (1999); *Kentucky v. Graham,* 473 U.S. 159, 167-168 (1985); *Luder v. Endicott,* 253 F.3d 1020, 1022-1023 (7th Cir. 2001)). Accordingly, suits against state officials in their individual capacities do not invoke the Eleventh Amendment's protections. *See id.* Because IDOC officials are considered an "arm of the State" when sued in their official capacities for money damages, such officials are entitled to raise the affirmative defense of immunity from suit under the Eleventh Amendment. *See Billman v. Indiana Dept. of Corr.*, 56 F.3d 785, 788 (7th Cir. 1995). *Cf. Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989)(citing *Graham*, 473 U.S. at 167 n.4)(holding that suits against state officials in their official capacity for injunctive relief are not treated as actions against the State).

Plaintiff brings suit against the IDOC Director Defendants, Medical Director Defendants, Warden Defendants, and Defendant Brown in both their personal and official capacities. *See* (Doc. 73). Plaintiff also requests compensatory and punitive damages from all defendants, as well as injunctive relief. *Id.* at p. 23. Defendants argue that the IDOC Director Defendants, Medical Director Defendants, Warden Defendants and Defendant Brown are entitled to summary judgment because they are protected from

suit in their official capacity.[2] (Doc. 198, p. 33-36). Plaintiff does not respond to this argument, and the Court considers it conceded. Accordingly, the Court grants summary judgment in favor of the defendants on Plaintiff's request for compensatory and punitive damages against the defendants in their official capacities.

## II.   Whether the Warden Defendants, Defendant Brown, or the Wexford Defendants Were Deliberately Indifferent to Plaintiff's Serious Medical Needs

A prisoner seeking to establish that the care he received in prison was so insufficient as to violate his Eighth Amendment rights must prove that: (1) he had an objectively serious medical need, and (2) the defendant prison official was deliberately indifferent to that need. *See Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). *See also Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005); *Langston v. Peters*, 100 F.3d 1235, 1240 (7th Cir. 1996); *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006). A medical condition is objectively serious if a physician has determined that treatment is mandated, or if it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Johnson v. Snyder*, 444 F.3d 579, 584-585 (7th Cir. 2006)(citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)), overruled on other grounds in *Hill v. Tangherlini*, 724 F.3d 965, 968 n.1 (7th Cir. 2013).

In order to be deliberately indifferent to an objectively serious medical need, a defendant must know of and disregard an excessive risk to the plaintiff's health. *See*

---

[2]     The IDOC Director Defendants, Warden Defendants and Medical Director Defendants apply this argument to "Defendants" broadly. *See* (Doc. 198, p. 33-36). However, because Plaintiff is only suing the IDOC Director Defendants, Medical Director Defendants and Defendant Brown in their official capacity, the Court only applies this argument to those defendants. *See* (Doc. 73).

*Greeno*, 414 F.3d at 653. This requires that the prison official "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists[;]" that official must then also draw that inference. *Farmer v. Brennan*, 511 U.S. 825, 837-838 (1994). Deliberate indifference is more than negligence; instead, the proper standard "approaches intentional wrongdoing." *Johnson*, 444 F.3d at 585. *See also Rosario v. Brown*, 670 F.3d 816, 821-822 (7th Cir. 2012)(requiring a plaintiff show that defendants had near "total unconcern" for the plaintiff's welfare). At a minimum, this standard implies "actual knowledge" of impending harm, "so that a conscious, culpable refusal to prevent harm can be inferred from the defendant's failure to prevent it." *Thomas*, 461 F. Supp. 2d at 793 (citing *Duckworth v. Franzen*, 780 F.2d 645, 653 (7th Cir. 1985), abrogated on other grounds by *Haley v. Gross*, 86 F.3d 630, 645 n.34 (7th Cir. 1996)). Accordingly, the failure to alleviate a risk officials should have perceived, but did not, is not a violation of the Eighth Amendment. *See Farmer*, 511 U.S. at 826.

### a. Whether the Warden Defendants or Defendant Brown had actual knowledge of a serious risk to Plaintiff's health

In their motion for summary judgment, the Warden Defendants and Defendant Brown argue that they cannot be liable for Plaintiff's claims of deliberate indifference in Count I because they were not personally responsible for the deprivation of Plaintiff's constitutional rights. (Doc. 198, p. 15). Specifically, Defendants argue that they deferred to the expertise of medical personnel (*Id*. at p. 25) and lacked actual knowledge of a serious risk to Plaintiff's health. *Id*. at p. 22-23. The Warden Defendants emphasize that they did not personally read Plaintiff's grievances and so did not have actual knowledge

of the complaints listed in those grievances. *Id.* at p. 15-16. While Defendant Brown admits that she did review Plaintiff's grievances, she claims that she deferred to the expertise of medical professionals in denying those grievances and took action to assist Plaintiff after reading the grievances. *Id.* at p. 17, 29.

When a prisoner is under a medical expert's care, non-medical prison officials are "generally justified" in presuming that the prisoner is receiving adequate medical treatment. *Arnett*, 658 F.3d at 755 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). If an official believes that a prisoner is receiving medical care, that official is not obligated to take further action, even if they are aware of the prisoner's serious medical condition. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). Requiring otherwise would undermine the general principle that prison officials are "responsible for their own misdeeds," but not responsible for the misdeeds of another. *Id.* This standard and its underlying rationale also applies between supervisors and their subordinates; an inmate may not demonstrate a non-medical official's deliberate indifference by showing mere negligence in that official's failure to detect and prevent a subordinate's misconduct. *See Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996).

However, if officials have actual knowledge of a subordinate's or doctor's mistreatment of an inmate and still decline to act, that official may be deliberately indifferent to the inmate's serious medical needs. *See Diggs v. Ghosh*, 850 F.3d 905, 911 (7th Cir. 2017); *Johnson v. Doughty,* 433 F.3d 1001, 1012 (7th Cir. 2006); *Greeno,* 414 F.3d at 655–656. In order to provide officials with actual knowledge, a prisoner must communicate an underlying issue to the officials sufficiently to alert them to an excessive

risk to the prisoner's health. *See Vance*, 97 F.3d at 993 (quoting *Farmer*, 511 U.S. at 837). Once an official is alerted to such a risk, the refusal to exercise the authority of the official's office may reflect deliberate disregard to the inmate's serious medical needs. *See Arnett*, 658 F.3d at 756.

The test for determining whether a defendant had such knowledge has two prongs: first, the defendant must be aware of the facts from which an inference could be drawn that a substantial risk of harm exists; second, the defendant must also draw this inference. *See Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015)(citing *Farmer*, 511 U.S. at 837). Although constructive knowledge is insufficient for meeting this burden, a plaintiff may prove a defendant's knowledge circumstantially. *See LaBrec v. Walker*, 948 F.3d 836, 841 (7th Cir. 2020). Sufficient circumstantial evidence of actual knowledge includes the very fact that a risk of harm was obvious. *See Farmer*, 511 U.S. at 832. Other examples of sufficient circumstantial evidence include showing, *e.g.*, that a defendant was so familiar with a plaintiff's (insufficient) treatment that he could thoroughly summarize the treatment for non-medical prison officials; that a defendant's approval was required before a plaintiff could receive treatments; or that a defendant explicitly acknowledged that other physicians requested a particular treatment for the plaintiff. *See Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008). However, the mere fact that the harm a plaintiff alleges was obvious and did, in fact, occur, does not inherently show that the defendant had actual knowledge of the harm. Hindsight is not the measure of a defendant's conduct in a claim for deliberate indifference. *See Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). *See also Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010)(noting that

although, in hindsight, a defendant physician's decision to release a plaintiff from medical observation "might have been a mistake[,]" the plaintiff's evidence nevertheless failed to show that the defendant was deliberately indifferent).

Grievances and other correspondences with prison officials only serve as evidence of those officials' actual knowledge when the content and manner of the communications give the officials sufficient notice to alert them to an excessive risk to an inmate's health or safety. *See Vance*, 97 F.3d at 993 (citing *Farmer*, 511 U.S. at 837). Those who review grievances may be liable for constitutional deprivations for which they bear no personal responsibility when the grievances provide the required notice and the reviewing officials nevertheless fail to exercise their authority to intervene on an inmate's behalf and rectify the situation. *See Perez v. Fengolio*, 792 F.3d 768, 782 (7th Cir. 2015). Even if the plaintiff lacks evidence that a reviewing official read or received the grievances at issue, the Court may infer a reviewing official's actual knowledge of the situation outlined in a grievance based on the number of grievances filed and the official's systematic ignoring of requests for redress. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995).

Defendants point out that the Warden Defendants and Defendant Brown were each involved in Plaintiff's medical care only in their supervisory capacity. (Doc. 198, p. 15-16). Neither of the Warden Defendants reviewed Plaintiff's grievances. *Id*. at p. 20. Furthermore, when the Warden Defendants or their signatories denied Plaintiff's grievances, they did so out of deference to the medical officials responsible for treating him. *Id*. at p. 26-27. Therefore, according to the Warden Defendants, neither defendant had actual knowledge of a risk to Plaintiff's health, and, if they did have such knowledge,

they did not ignore that risk, but instead deferred to the expertise of medical professionals.

In response, Plaintiff claims that the Warden Defendants cannot escape liability by passing along the responsibility to review grievances to subordinate officials. (Doc. 213, p. 71). Plaintiff also contends that he spoke directly with Defendants Spiller and Lashbrook regarding the allegations in his grievances, giving the two defendants actual knowledge of the risk of harm to Plaintiff's health even if they never personally read his grievances. *Id*. Neither Defendant Lashbrook nor Defendant Spiller took action to investigate or intervene on Plaintiff's behalf after communicating with Plaintiff; in fact, according to Plaintiff, Defendant Spiller routinely refused to read inmates' grievances, believed grievances were merely a piece of paper "[y]ou can write anything on," and regularly denied them without further investigation. *Id*. (citing to Defendant Spiller's Deposition, Doc. 213, Exh. J, at 124:12-13, 139:9-23).

Though wardens may delegate the responsibility to review grievances to subordinates, if a warden "simply has a policy of not reading complaints from prisoners, it could be considered intentional ignorance, which can carry the same consequences as actual knowledge." *See Birch v. Jones*, No. 02 CV 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004)(citing *Powell v. Godinez,* No. 93 C 3469, 1997 WL 603927, at *5 (N.D. Ill. Sept. 24, 1997)). By delegating the responsibility to review grievances, a warden may effectively consent to and approve of how those grievances are handled. *Id*. For example, in *Birch*, the plaintiff filed a grievance complaining that, although he is white, he was regularly celled with inmates of other races. *Id*. at *3. The plaintiff's grievance counselor denied his

grievance; however, shortly thereafter, the plaintiff's cellmate physically attacked him. *Id*. The Court noted that the plaintiff's grievance was insufficient in manner and content to alert officials to a risk to the plaintiff's safety. *Id*. at *5. However, in dicta, the Court rejected the assertion that delegating the authority to read those grievances permitted the warden to escape liability. *Id*. at *7. The warden defendant therefore escaped liability not because he did not have actual knowledge of the events at issue in the plaintiff's grievance, but because the grievances themselves were insufficient to put the defendant on notice of a risk to the plaintiff's health. *Id. Cf. Drapes v. Hardy*, 14 C 9850, 2019 WL 1425733, at *6 (N.D. Ill. Mar. 29, 2019)(holding that the defendant warden had actual knowledge of a serious risk to the plaintiff's health despite delegating the responsibility to review grievances to subordinates because the warden told the plaintiff that if he wrote the warden a letter, the warden would make sure the plaintiff was taken to the health care unit).

The Warden Defendants' contention that they deferred to the expertise of medical professionals when denying Plaintiff's grievance does not hold up when examined in the context of Defendant Spiller's framing of inmate grievances. If Defendant Spiller or his signatory regularly denied grievances as mere opinions, it is unlikely that he read the grievances thoroughly enough to know whether Plaintiff was being treated or mistreated by a medical professional. Instead, Defendant Spiller's comments suggest an intentional policy of ignorance to inmate's grievances. From this intentional ignorance, the Court may construe actual knowledge of the risk to Plaintiff's health from Plaintiff's lack of medical care, access to medicine, and specialized diet. Therefore, because he took no

action to investigate or intervene on Plaintiff's behalf, a reasonable jury could conclude that Defendant Spiller exhibited deliberate indifference to Plaintiff's serious medical needs.

Similarly, Defendant Lashbrook cannot avoid liability by arguing that she relied on others' medical expertise and lacked actual knowledge of Plaintiff's serious medical needs. Plaintiff provides detailed accounts of his conversations with Defendant Lashbrook, in which, Plaintiff claims, Defendant Lashbrook told him to "just have patience" and that she was "working on" his situation. (Doc. 213, p. 67). As in *Drapes*, Defendant Lashbrook's personal statement that she would work to remedy Plaintiff's situation demonstrates actual knowledge of Plaintiff's serious medical needs; the resulting failure to then investigate Plaintiff's claims establishes deliberate indifference to those needs.

Defendants make a similar argument in support of summary judgment on behalf of Defendant Brown. Although Defendant Brown did review Plaintiff's grievances, Defendants claim that she examined Plaintiff's medical chart and noted the medications and treatment Plaintiff was receiving in order to ensure Plaintiff had access to medical care. (Doc. 213, p. 17). After determining that Plaintiff's complaints were being addressed and noting that Plaintiff's medical forms indicated he was receiving medication on days he claims he did not, Defendant Brown sent Plaintiff a reminder indicating how to refill his medications. *Id*. at p. 29. Therefore, Defendant Brown deferred to the medical experts who prepared Plaintiff's medical chart and forms and fulfilled her obligation to intervene on Plaintiff's behalf by reminding him how to refill his prescriptions.

Plaintiff objects to Defendant Brown's characterization of her involvement in Plaintiff's medical care. (Doc. 213, p. 72). Plaintiff points out that both he and his wife talked to Defendant Brown directly about his lack of medical care and his missing medication doses. *Id*. at p. 73-75. However, Defendant Brown responded only partially to Plaintiff's grievances and ignored his claims that he was not receiving medications and that he required a specialized diet. *Id*. Though Defendant Brown sent Plaintiff a memorandum outlining how to refill his prescriptions, Plaintiff asserted in his grievances that he was not receiving his medications *despite* properly requesting refills. *Id*. at p. 75 (emphasis added).

Reviewing officials are entitled to rely on medical staff's judgment regarding proper treatment of an inmate, but they are not entitled to ignore an inmate's claims regarding obvious lapses in the execution of that judgment. *See Flournoy v. Ghosh*, 881 F. Supp. 2d 980, 991 (N.D. Ill. 2012). For instance, in *Flournoy*, the plaintiff filed numerous grievances noting that medical personnel were not refilling his prescriptions. *Id*. The response to each of these grievances noted that the issue was "resolved[;]" however, no explanation was ever given for the delays. *Id*. The Court stated that the obvious contention that prescriptions should be refilled required no medical judgment. *Id*. Furthermore, the Court found that the unresponsive nature of the grievances could alert prison officials to a serious risk to inmate health. *Id*. (citing to *Martinez v. Garcia*, No. 08 C 2601, 2012 WL 266352, at *5 (N.D. Ill. Jan. 30, 2012)). In fact, "even someone with no medical training could have concluded[,]" based on the grievance responses, "that

something might be seriously wrong with the way that prescription medications were being provided[.]" *Id.*

Defendant Brown's replies to Plaintiff's grievances were clearly non-responsive. Though Plaintiff complained that personnel were delaying refills of his medications despite his proper requests, Defendant Brown merely reminded Plaintiff how to request a refill. Although Plaintiff grieved that officials were not properly treating his medical conditions, Defendant Brown merely noted the medications and treatments Plaintiff was receiving as listed in his chart. Finally, Defendant Brown took no action to investigate whether Plaintiff's claims that he was denied a proper diet were indicative of medical officials' mistreatment of Plaintiff. Plaintiff's grievances afforded Defendant Brown with sufficient notice that medical officials may have been mistreating him. Accordingly, a reasonable jury could find that Defendant Brown demonstrated deliberate indifference by failing to exercise her power in order to investigate or intervene on Plaintiff's behalf. Therefore, summary judgment is denied on Count I as to the Warden Defendants and Defendant Brown.

### b. Whether the Wexford Defendants were Deliberately Indifferent to Plaintiff's Serious Medical Needs

The Wexford Defendants approach each claim in Count I of Plaintiff's complaint separately. First, the Wexford Defendants assert that neither Defendant Shah nor Defendant Scott had actual knowledge that Plaintiff was not receiving his medications from NRC staff. (Doc. 193, p. 4, 24). Furthermore, the Wexford Defendants claim that they did not act with deliberate indifference to Plaintiff's serious medical needs because the

defendants provided Plaintiff with valid prescriptions and treated Plaintiff's various medical conditions. *Id.* at p. 5-17; 24-26.

Second, Defendant Shah posits that he appropriately treated and controlled Plaintiff's various medications given that Plaintiff's blood work during his incarceration remained consistent with the conditions he had prior to his incarceration. *See, e.g.,* (Doc. 193 at p. 13-17 (discussing Plaintiff's hypertension); 31-34 (describing Plaintiff's hyperkalemia)). When Plaintiff's medical levels worsened, Defendant Shah argues that Plaintiff merely experienced the natural progression of his conditions. *See, e.g., (Id.* at p. 22 )(considering Plaintiff's chronic kidney disease)).

Third, according to Defendant Shah, Plaintiff received a diet appropriate for his medical needs; therefore, Defendant Shah was not deliberately indifferent to a serious risk to Plaintiff's health. (Doc. 193, p. 35). Many inmates decline specialized diets because they do not intend to follow the restrictive guidelines. *Id.* Pointing to Plaintiff's pre-incarceration complaints about hospital foods and his tendency to buy food from the commissary during his incarceration, Defendant Shah argues that circumstantial evidence shows that Plaintiff would not have followed the diet he requested even if Defendant Shah had ordered it. *Id.* at p. 35-36.[3]

---

[3]     Defendant Scott also argues that he provided Plaintiff with appropriate treatment for his gout (Doc. 193, p. 26-29) and hyperkalemia (*Id.* at p. 38-39); he also claims that he did not have actual knowledge of Plaintiff's concerns regarding a specialized diet. *Id.* at p. 39-40. However, the Court dismissed Defendant Scott from all claims in Count I of Plaintiff's complaint, except for those claims regarding continuous and timely access to Plaintiff's required medications. (Doc. 127, p. 20). The Court therefore declines to consider arguments regarding Defendant Scott's involvement in these claims.

Lastly, and in the alternative, the Wexford Defendants claim that prisoner-plaintiffs cannot succeed on Eighth Amendment claims unless those plaintiffs show physical harm. *See, e.g.,* (Doc. 193, p. 11)(outlining the physical harm standard and applying it to Plaintiff's claim regarding access to medications); 17 (applying the same argument to Plaintiff's claim regarding his medical treatment)). Because Plaintiff's blood work showed levels similar to his pre-incarceration levels, and because outside specialists agree that Plaintiff did not suffer acute rejection during his incarceration, the Wexford Defendants assert that Plaintiff suffered, at most, emotional and mental harm. *Id*. at p. 12. Similarly, the Wexford Defendants note that Plaintiff cannot point to any physical harm resulting from his non-specialized diet. *Id*. at p. 40-41.

1. *Whether the Wexford Defendants had Actual Knowledge of Plaintiff's Missed Medications*

Defendant Shah argues that he lacked actual knowledge that Plaintiff was not continuously receiving his medications while incarcerated at the NRC because medication issues for NRC inmates were handled internally by NRC staff. (Doc. 193, p. 4). NRC staff would directly address an inmate's concerns, and NRC nurses would alert NRC doctors to any issues regarding an inmate's prescriptions. *Id*. Furthermore, from the moment NRC staff conducted an intake interview with an inmate, NRC staff would assume responsibility for that inmate's medication by taking and administering the medicine and writing prescriptions for those which needed to be refilled. *Id*. Defendant Shah would not know of any issue regarding NRC administration of prescriptions until an inmate returned to Pinckneyville. *Id*.

Defendant Shah's argument is predicated on the NRC's responsibility for its inmates. Between October 29, 2014 and February 4, 2015, Plaintiff was housed at the NRC on a writ. *See* (Doc. 73). Plaintiff points out that the NRC is "limited" in its ability to provide inmates' with medical care. (Doc. 213, p. 11). Therefore, inmates housed at the NRC on writ "belong" to another institution for the purposes of medical care. *Id*. For inmates transferred on writ, Plaintiff alleges that the parent facility, rather than the NRC, would remain responsible for the inmate's medical care. *Id*. There appears to be a material dispute of fact over the role that the NRC plays in the treatment on inmates transferred on writ. Therefore, Defendant Shah does not carry his burden of proof in providing evidence that Plaintiff's complaints during these times would not be relayed to him due to Plaintiff's writ status. *Cf. Verser v. Smith*, Case No. 14 C 1187, 2017 WL 528381, at *9-10 (N.D. Ill. Feb. 9, 2017)(granting summary judgement in favor of defendants associated with the NRC when those defendants showed that they relied on the medical transfer summary provided by the parent institution and noting that all writ medical documentation is sent to the parent facility per NRC policy). Whether Defendant Shah had actual knowledge that Plaintiff was not receiving his medications during this time period therefore remains a genuine question of fact.

Furthermore, Defendant Shah cannot show that he lacked actual knowledge that Plaintiff missed doses of his medications, both while housed at the NRC and while housed at Pinckneyville. Plaintiff states that he told Defendant Shah about his missed medications at "every opportunity," including in personal discussions and through request slips. (Doc. 193, p. 37-38). Plaintiff's medical administration records, in which

staff would note whether Plaintiff received his medications, also contained missing dates in February 2014. *Id*. at p. 10. One of the records even contained a handwritten note stating, "tell nurse – not getting meds. 'I'm out.'" *Id*. Both Plaintiff's conversations with Defendant Shah and his medical administration records would alert Defendant Shah to a serious risk to Plaintiff's health at the NRC; accordingly, a reasonable jury could conclude that Defendant Shah exhibited deliberate indifference by failing to exercise his power to investigate these claims. *See Arnett*, 658 F.3d at 756.

Plaintiff also points out that staff did not administer his anti-rejection medication, CellCept, during March 2014 while Plaintiff was housed at Pinckneyville. (Doc. 213, p. 10). A nurse practitioner's note on Plaintiff's medical administration records states that as of March 26, 2014, Defendant Shah was "made aware of the situation [two] days ago." (Doc. 215, Exh. 59, p. 5). Though Defendant Shah does not recall this conversation (*Id*. at Exh. 9, 121:1-9), this note establishes a genuine dispute of fact regarding whether Defendant Shah had actual knowledge that Plaintiff was not receiving his CellCept while housed at Pinckneyville. Because Defendant Shah admits that he took no action to remedy the situation after March 24, 2014 (*id*.),[4] a reasonable jury could conclude that Defendant Shah was deliberately indifferent to Plaintiff's serious medical needs.

---

[4]     The Wexford Defendants establish that Plaintiff had valid prescriptions for all of his medications during the time period in question. *See* (Doc. 193, p. 5-11; 24). Defendant Shah and Defendant Scott further argue that Plaintiff has failed to show conclusively that he properly requested refills of his medication. *Id*. However, this argument misconstrues Plaintiff's claims. Count I of Plaintiff's complaint is predicated on the allegation that the Wexford Defendants were responsible for failing to remedy a breakdown in the administration of Plaintiff's medications, as Plaintiff claims he repeatedly and correctly requested refills of his prescriptions. (Doc. 213, p. 38). At this stage of the proceedings, Plaintiff does not bear the burden of proving that he correctly requested refills of his prescriptions; the Wexford Defendants are instead required to show that Plaintiff *did not* request refills. *See Regensburger,* 138 F.3d at 1205 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Defendants offer no such evidence.

Defendant Scott similarly argues that he lacked the actual knowledge necessary to be deliberately indifferent to Plaintiff's claims regarding his missed medications. Defendant Scott assumed responsibility for Plaintiff's care when he took over Defendant Shah's position in January 2016. (Doc. 193, p. 24). By that time, nurse practitioners directly administered all of Plaintiff's medications under direct observation. *Id*. Therefore, members of the nursing staff distributed Plaintiff's medications; Defendant Scott had no involvement in ensuring Plaintiff received his medications. *Id*. Defendant Scott asserts that he cannot be held liable for the actions of his subordinates unless he had actual knowledge of those actions. *Id*. Furthermore, though Plaintiff wrote grievances regarding the missed medications, Defendant Scott did not review those grievances; the review of such grievances was the responsibility of IDOC officials. *Id.* at p. 25. Accordingly, because there is no evidence that Defendant Scott had such knowledge, he argues summary judgment is appropriate. *Id*.

Though numerous and descriptive, Plaintiff's grievances are insufficient to establish that Defendant Scott had actual knowledge of Plaintiff's missed medication. (Doc. 213, p. 49-50). There is no evidence that Defendant Scott read those grievances, not because Defendant Scott systematically ignored such grievances, but because reading them was not his responsibility. *Cf. Birch*, 2004 WL 2125416, at *7. However, Plaintiff also asserts that the first time he met with Defendant Scott, he directly told him about his medication issues. (Doc. 213, p. 49). During this conversation, Defendant Scott promised that Plaintiff would not have any further issues with his medications. (Doc. 215, Exh. B, 181:5-9). Plaintiff's direct conversation with Defendant Scott sufficiently alerted him to

Plaintiff's missed medications. Furthermore, Defendant Scott's personal promise to remedy the situation demonstrates that he had actual knowledge of the issue. *See Drapes*, 2019 WL 1425733, at *6. Therefore, by failing to exercise the power of his office to ensure that his subordinate's actually provided Plaintiff with his medications, a reasonable jury could find that Defendant Scott demonstrated deliberate indifference to Plaintiff's serious medical needs.

2.   *Whether Defendant Shah Appropriately Treated Plaintiff's Hypertension*

Plaintiff asserts that Defendant Shah was deliberately indifferent to Plaintiff's hypertension because he regularly noted that Plaintiff's blood pressure was elevated, but failed to take any action in order to lower Plaintiff's blood pressure. (Doc. 213, p. 53).[5] For instance, a "well-controlled" blood pressure level for a patient with diabetes or renal disease is less than 130/80, while 150/100 would be considered "high blood pressure." *Id.* at p. 17, n.3. Plaintiff's blood pressure, however, regularly measured between 138/90 and 177/98. *Id.* Rather than taking action, Plaintiff claims that Defendant Shah merely ordered Plaintiff to continue his current medications and to take Hydralazine, a blood pressure medication. *Id.* at p. 53. Furthermore, although Plaintiff's outside doctors at Barnes Jewish Hospital recommended Plaintiff take 50 mg of Hydralazine twice daily,

---

[5]     Plaintiff also claims that he is not abandoning his claim regarding Defendant Scott's treatment of Plaintiff. (Doc. 213, p. 52 n. 12). However, the Court dismissed Defendant Scott from all claims in Count I except those relating to Plaintiff's access to his medications. (Doc. 127, p. 20). The Court therefore refuses to consider Plaintiff's allegations against Defendant Scott on this claim.

Plaintiff states that, until June 2015, he only received enough medication to take Hydralazine once daily. *Id.* at p. 54.

Defendant Shah notes that Plaintiff's blood pressure levels remained consistent between his pre-incarceration and incarceration care. (Doc. 193, p. 14). Specifically, Plaintiff's blood pressure measured at 157/105 prior to his incarceration; his later measurements remained consistently within that range. *Id.* Though Defendant Shah concedes that a reasonable baseline for patients with Plaintiff's comorbidities is in the 130s/80s, he also points out that blood pressure is particularly difficult to control for those patients. *Id.* at p. 15. Defendant Shah further argues that he took constructive action to control Plaintiff's blood pressure. For example, on February 17, 2014, Plaintiff's blood pressure measured 160/100. Although Defendant Shah recommended continuing Plaintiff's medication and adding Hydralazine, by the next day, Plaintiff's blood pressure had dropped to 138/90. *Id.* at p. 14. Finally, Defendant Shah assigns Plaintiff's missing Hydralazine doses to a medical administration error noting that a nurse practitioner wrote Plaintiff's prescription incorrectly; this error was corrected when staff was alerted to it. *Id.* at p. 15.

The prison physician is a prisoner's primary care physician, and as such, that physician is "free to make his own determination" on the basis of professional judgment. *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). Courts are to examine these determinations using a totality of the circumstances analysis. *See Jones v. Simek*, 193 F.3d 485, 490-491 (7th Cir. 1999); *Petties*, 836 F.3d at 729. If a plaintiff can show

that no minimally competent professional would have so determined under those circumstances, summary judgment is not appropriate. *See Collignon*, 163 F.3d at 989.

In contrast, a plaintiff has not provided sufficient evidence to overcome summary judgment where he merely shows evidence that *some* professionals would have chosen a different course of treatment. *See Petties*, 836 F.3d at 729 (citing *Steele v. Choi*, 82 F.3d 175, 179 (7th Cir. 1996)) (emphasis in original). When a specialist instructs the physician to pursue a different course of treatment, a physician's failure to do so may indicate deliberate indifference. *See Arnett*, 653 F.3d at 752. When a plaintiff shows that a treating physician failed to follow a specialist's instruction, that plaintiff has sufficiently alleged deliberate indifference to survive a motion for summary judgment. *See, e.g., Jones,* 193 F.3d at 490-491 (7th Cir. 1999)(reversing summary judgment for a prison doctor who failed to follow a specialist's advice).

Similarly, persisting in a course of ineffective treatment constitutes cruel and unusual punishment in violation of the Eighth Amendment when a defendant doctor chooses the "easier and less efficacious treatment" without exercising professional judgment. *Arnett* 658 F.3d at 754 (internal citations omitted). *See also White v. Napoleon*, 897 F.2d 103, 109 (3rd Cir. 1990)(finding a violation of the Eighth Amendment where a defendant doctor insisted on continuing the same course of treatment when that doctor knew the treatment was painful and ineffective). The standard is not whether a plaintiff took steps to request a specific, different course of treatment. Instead, the proper analysis considers whether the defendant doctor knew he was providing deficient treatment. *See Petties*, 836 F.3d at 726.

Defendant Shah did not fail to follow the recommendations of the specialists treating Plaintiff at Barnes Jewish Hospital. Instead, Defendant Shah's Hydralazine prescription followed the treating doctors' advice. Although Plaintiff did not initially receive medication in compliance with that prescription, there is no evidence that Defendant Shah was aware of that lapse, as the issue was corrected shortly thereafter. Furthermore, Defendant Shah did not fail to exercise professional judgment in continuing Plaintiff's treatment for hypertension as he added Hydralazine to Plaintiff's treatment regimen in response to his elevated blood pressure. Because Defendant Shah was not deliberately indifferent in his treatment of Plaintiff's medical conditions, summary judgment is granted as to this portion of Plaintiff's claim in Count I.

3. *Whether Defendant Shah Demonstrated Deliberate Indifference by Declining to Prescribe Plaintiff a Specialized Diet*

Plaintiff asserts that Defendant Shah's failure to prescribe Plaintiff a low-potassium diet, which was needed to manage his hyperkalemia, is indicative of deliberate indifference to Plaintiff's serious medical needs. (Doc. 213, p. 59). Plaintiff points out that after his February 2014 hospitalization, his discharge instructions mandated that he maintain a low-potassium diet. *Id.* at p. 60. However, Defendant Shah declined to order such a diet for Plaintiff. *Id.* at p. 61. In October 2014, Wexford's renal teleclinic nephrologist again recommended Plaintiff be placed on a low-potassium diet. *Id.* However, Defendant Shah again placed Plaintiff on a regular diet. *Id.*

Defendant Shah asserts that he did not place Plaintiff on a specialized diet because "90 percent" of his patients do not want a diet that would restrict their ability to purchase

items from the commissary and order "whatever they want." (Doc. 193, p. 35). Instead, Defendant Shah points out that he educated Plaintiff on how to maintain an appropriate diet for managing both his hyperkalemia and his diabetes. *Id.* at p. 36. Nevertheless, Plaintiff "ate everything on his meal tray" and purchased foods from the commissary, including those which would negatively impact his hyperkalemia. *Id.* at p. 37. Defendant Shah also notes that Plaintiff did not follow a low-potassium diet after his release from Pinckneyville. *Id.* at p. 35. Therefore, Defendant Shah invites the Court to conclude that Plaintiff was likely one of the ninety percent of patients who would not have followed a specialized diet even if Defendant Shah had ordered him one. Finally, despite Plaintiff's continued poor eating habits, Defendant Shah claims that Plaintiff's hyperkalemia was under control without a specialized diet. *Id.* at p. 37. Therefore, a specialized diet was unnecessary, and Defendant Shah was not deliberately indifferent in failing to prescribe one for Plaintiff.

Plaintiff responds that he "begged and pleaded" with Defendant Shah for a specialized diet. (Doc. 213, p. 62). However, Defendant Shah informed Plaintiff that Pinckneyville did not have a special diet for inmates. *Id.* Furthermore, Plaintiff states that he purchased commissary items in order to trade with other inmates for materials with which to write grievances; he further claims he would have followed a specialized diet had one been prescribed. *Id.* at p. 62-63. Plaintiff also argues that his potassium reached dangerously high levels during his incarceration. *Id.* at p. 90. According to Plaintiff's medical expert, these fluctuations could have been "easily managed" with a low-potassium diet. *Id.*

Particularly concerning is Defendant Shah's decision to forego prescribing Plaintiff a specialized diet after his February and October 2014 discharge instructions mandated such a diet. A defendant physician is not necessarily deliberately indifferent to an inmate's serious medical needs when that physician does not follow a specialist's advice, as mere difference of opinion between professionals does not give rise to deliberate indifference. *See Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997).  The operative distinction is whether the two physicians disagree about a subjective issue of medical judgment or whether the treating physician deliberately mistreated the plaintiff. *Id*. (citing *Estelle*, 429 U.S. at 107).

The assumption that Plaintiff would not follow a low-potassium diet is not predicated on medical judgment, but is instead a broad evaluation of prisoner habits, which may or may not be grounded in fact. Here, it is clear that Defendant Shah did not simply disagree with Plaintiff's hospital doctors. Though Defendant Shah argues Plaintiff's potassium was well-managed, there is no evidence in the record that Defendant Shah chose not to prescribe Plaintiff a specialized diet for that reason. Furthermore, contrary to Defendant Shah's assertion, Plaintiff provides evidence showing that his potassium was not well-managed during his incarceration at Pinckneyville. Accordingly, the Court finds that a reasonable jury could find Defendant Shah was deliberately indifferent to Plaintiff's hyperkalemia by failing to prescribe him a low-potassium diet.

4. _Whether Plaintiff is Required to Show Physical Harm_

The Wexford Defendants consistently assert that Plaintiff is required to show physical harm in order to avoid summary judgment on an Eighth Amendment claim. (Doc. 193, p. 11; 17). According to the Wexford Defendants, the Prison Litigation Reform Act prohibits inmates from bringing a civil action for mental or emotional injury suffered during the inmate's custody without first showing physical injury. *Id*. at p. 11 (citing 42 U.S.C. § 1997e(e)). The Seventh Circuit has resoundingly rejected the Wexford Defendants' interpretation of the Prison Litigation Reform Act, as such an interpretation would permit officials to "maliciously and sadistically inflict psychological torture on prisoners, so long as they take care not to inflict any physical injury in the process." *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) (internal citation omitted). The Prison Litigation Reform Act instead limits the type of damages for which an inmate may sue. *See Rasho v. Elyea*, 856 F.3d 469, 477 (7th Cir. 2017); *see also Cook v. Ill. Dep't of Corr.*, No. 3:15-cv-83-NJR-DGW, 2018 WL 294515, at *4 (S.D. Ill. Jan. 4, 2018).

Moreover, the record indicates that a reasonable jury could find that Plaintiff *did* suffer physical harm during his incarceration. Plaintiff's medical records indicate that he experienced worsening chest pain, shortness of breath, and kidney issues during his incarceration. (Doc. 213, p. 89). Plaintiff's expert witness and Defendant Wexford and the Wexford Defendants' expert witness disagree as to the causation of these injuries. Thus, this question remains open for a trier of fact to decide at trial. (Compare *id.* with Doc. 193, p. 15). Accordingly, the Court rejects the Wexford Defendants' arguments that summary should be granted because Plaintiff did not experience physical harm.

III.   **Whether Defendant Wexford, the IDOC Director Defendants, or the Medical Director Defendants Employed an Unconstitutional Practice or Custom Violating Plaintiff's Eighth Amendment Rights**

Plaintiff asserts that Defendant Wexford, the IDOC Director Defendants, and the Medical Director Defendants established and participated in a practice and custom of medical mismanagement of intersystem transfers between the NRC and Pinckneyville. (Doc. 73, ¶ 125). Plaintiff claims that Defendants knew of this practice but failed to protect him from harm. *Id*. at ¶¶ 126-127. Instead, Defendants failed to ensure inmates had continuous access to medications and failed to ensure that transferred prisoners received uninterrupted medical care. *Id*. at ¶ 128. The Court finds that a reasonable jury could find that Defendant Wexford adopted an unconstitutional policy or custom. However, the Court finds that a reasonable jury could only find that the IDOC Director Defendants and Medical Director Defendants adopted an unconstitutional policy or custom in their *official* capacity; it cannot make this finding regarding the IDOC Director Defendants and Medical Director Defendants in their *individual* capacity.[6] Accordingly, the Court grants summary judgment on this count for the IDOC Director Defendants and Medical Director Defendants in their individual capacity and notes that Plaintiff may only pursue

---

[6]     The Court notes that the Seventh Circuit has critiqued the fracturing of doctrinal elaborations on theories of responsibility in § 1983 jurisprudence into "disparate liability rules," including the severing of *Monell* liability and *respondeat superior* liability as applied to private corporations, like Defendant Wexford, and the distinction between individual and official liability, as discussed *infra. Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021) (internal citations omitted). However, the Seventh Circuit noted that "[r]epair of the creaky doctrinal structure" must come from the Supreme Court or Congress, and thus, this Court is bound to apply the controlling circuit precedent at this time. *Id*. at 653-654 (citing *Shields*, 746 F.3d at 786, and noting that, in *Shields*, the Court followed precedent, but criticized the extension of *Monell* to private corporations).

injunctive relief on this count against Defendant Jeffreys, the acting IDOC Director, in his official capacity.

    *a. Whether Defendant Wexford Adopted an Unconstitutional Policy or Custom*

The doctrine of *respondeat superior* does not apply to suits filed under § 1983. *See Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014)(citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)). In *Monell v. Dep't of Social Services of the City of New York*, however, the Supreme Court held that a municipality may be liable under § 1983 for constitutional violations resulting from a policy or custom of the municipality. 436 U.S. 658, 690–691 (1978). The Seventh Circuit has extended *Monell* beyond municipalities to include private corporations providing government services, such as Defendant Wexford. *See Shields*, 746 F.3d at 789. Precedent establishes that a private corporation contracting to provide healthcare to inmates may be liable for customs or policies which violate an inmate's constitutional rights. *See Howell,* 987 F.3d at 653; *Minix*, 597 F.3d at 832 (internal citations omitted) (stating that such "contractors are treated the same as municipalities for liability purposes in a § 1983 action"). Therefore, like municipalities, a corporation that has contracted to provide essential government services may be held liable under § 1983 for violations caused by unconstitutional policies or customs. *See Shields*, 746 F.3d at 789.

A plaintiff may show liability under *Monell* in three ways. First, a plaintiff may establish that the unconstitutional action "'implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017)(en banc)

(quoting *Los Angeles County v. Humphries*, 562 U.S. 29, 35 (2010)). Second, the plaintiff may prove that a custom was created by "'those whose edicts or acts may fairly be said to represent official policy.'" *Glisson*, 849 F.3d at 379 (quoting *Monell*, 436 U.S. at 690-691). Lastly, a plaintiff may demonstrate liability by establishing a widespread custom. *See Glisson*, 849 F.3d at 379. Liability may extend to customs "so permanent and well settled as to constitute a custom or usage with the force of law" even though they received no formal approval. *See Monell*, 436 U.S. at 91 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168 (1970)).

A widespread custom may be established by evidence of policymaking officials' knowledge of and acquiescence to the unconstitutional practice. *See McNabola v. Chicago Transit Authority*, 10 F.3d 501, 511 (7th Cir. 1993). This standard is similar to that required to show deliberate indifference; a plaintiff may show that officials knew of and acquiesced to a risk created by a custom or practice, but nevertheless failed to take steps to protect the plaintiff. *See Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Sufficient evidence may include proof that the practice was so "long standing or widespread" that it would "support the inference that policymaking officials 'must have known about it but failed to stop it.'" *McNabola*, 10 F.3d at 511 (quoting *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1481 (11th Cir. 1991)). If officials would be required to make a new rule or regulation in order to end the unconstitutional policy, the failure to do so is also sufficient evidence of acquiescence. *See Thomas*, 604 F.3d at 303 (citing *Sims v. Mulcahy*, 902 F.2d 524, 543 (7th Cir.1990)). Similarly, senior officials may be liable if they

personally created the policies, practices, or customs at issue. *See Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 615 (7th Cir. 2002).

Defendant Wexford, the IDOC Director Defendants, and the Medical Director Defendants argue that Plaintiff cannot point to sufficient instances of inmates being deprived of medical care or medications to show a widespread practice or custom.[7] (Doc. 198, p. 19; Doc. 193, p. 44). However, Plaintiff provides twenty-eight instances in which he missed doses of his anti-rejection medications over a period of thirty months. (Doc. 213, p. 78-80). Although Plaintiff provides no specific instances of other inmates missing their medication, he does claim that Defendant Scott testified during his deposition that inmates complained of missing medications "all the time." *Id*. at p. 79. Plaintiff further points out that the Wexford corporate representative admitted to systemic and widespread underreporting errors in the documentation of inmates' medication administration. *Id*. at p. 82-83.

A defendant must have actual or constructive notice of an omission in its policies which result in constitutional violations in order to be liable under *Monell. See Connick v. Thompson*, 563 U.S. 51, 61 (2011). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a

---

[7] Defendant Wexford also claims that, in order to show liability under § 1983 under a practice or custom theory, Plaintiff must be able to establish that an individual liable for executing the unconstitutional policy was the "but-for" cause of Plaintiff's injury. (Doc. 193, p. 42, 45). This is a misstatement of law post-*Glisson*. After the Seventh Circuit's decision in *Glisson*, the operative question in a *Monell* case is whether a policy or custom gave rise to the harm, "or if instead the harm resulted from the acts of the entity's agents." *Glisson*, 849 F.3d at 379. Corporations or municipalities may be liable even when one individual is not responsible for executing the underlying unconstitutional policy if a plaintiff instead shows that the body's officers "adopted and promulgated" the unconstitutional policy, which is what Plaintiff alleges here. *Id*.

training program that will cause violations of constitutional rights." *Id*. at 61. Accordingly, a plaintiff may demonstrate a defendant's actual or constructive knowledge through one of two evidentiary paths: (i) a theory predicated on a prior pattern of similar constitutional violations; or (ii) a "single-incident" theory predicated on an obvious, but disregarded, risk demonstrated by a violation of a single person's constitutional rights. *See J.K.J v. Polk County*, 960 F.3d 367, 381 (7th Cir. 2020). *See also Id.* at 389 (Brennan, J. dissenting in part)(acknowledging that majority's decision was based on "single-incident theory"); *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 409 (1997)(finding that, in "a narrow set of circumstances[,]" a plaintiff may show *Monell* violations with a "single-incident" theory of liability).

Under the first evidentiary path, it is not impossible for a plaintiff to show a widespread practice or custom using only personal experience, though it is "necessarily more difficult" for that plaintiff to differentiate the alleged practice from a "random event." *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020)(citing *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)(internal quotations omitted)). The Seventh Circuit has not adopted a bright-line quota defining how many examples are sufficient to constitute a widespread custom. *See Id*. However, the Seventh Circuit has consistently declined to find such a custom when plaintiffs can show only a few instances of unconstitutional conduct over a long period of time. *See, e.g., Thomas*, 604 F.3d at 303 (internal citations omitted)(noting that there must be, at least, more than three examples of unconstitutional conduct); *Doe v. Vigo Cty.*, 905 F.3d 1038, 1045 (7th Cir. 2018)(rejecting a widespread policy argument when the plaintiff pointed to five incidents spread over more than

twenty years); *Estate of Moreland v. Dieter*, 395 F.3d 747, 760 (7th Cir. 2005)(holding that three instances of improper pepper-spraying over three years did not establish a widespread custom); *Gable v. City of Chicago*, 296 F.3d 531, 538 (7th Cir. 2002)(finding that three instances of improperly denying rightful owners their vehicles from impoundment lots over four years did not constitute a widespread policy). On this path, it is therefore unlikely that Plaintiff will be successful. Though he demonstrates numerous instances of conduct which violate *his* constitutional rights, he has little evidence showing that others' rights were similarly violated.

However, a reasonable jury could find that Plaintiff sufficiently demonstrates Defendant Wexford's liability through the second evidentiary path. While a party may demonstrate actual knowledge of an unconstitutional policy or custom by pointing to numerous instances of the violation, neither the Supreme Court nor the Seventh Circuit has held that "institutional liability was only possible if the record reflected numerous examples of the constitutional violation in question." *Glisson*, 849 F.3d at 381 (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989)).[8]  *See also Howell*, 987 F.3d at 655 (7th Cir. 2021)(internal citations omitted)(noting that, in the healthcare context, it may be impossible to assign blame to any one individual, but holding that, nevertheless, the entity responsible for the overall policy may be liable); *Daniel v. Cook Cty.*, 833 F.3d 728, 733-734 (7th Cir. 2016)(finding that an entity cannot escape liability under *Monell* by

---

[8]      The Seventh Circuit in *Glisson* also supports this proposition by citing to the Ninth and Third Circuits, both of which have also declined to find that a plaintiff must show numerous constitutional violations in order to succeed in a *Monell* claim. 849 F.3d at 381 (citing *Long v. Cnty. of Los Angeles*, 442 F.3d 1178 (9th Cir. 2006); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575 (3d Cir. 2003)).

blaming the "system"). The key analysis is whether there was a conscious decision not to take action. *See id.* Accordingly, a plaintiff may show actual knowledge of an unconstitutional policy or custom by demonstrating that the risk of violation was "so obvious that the failure to do so could properly be characterized as deliberate indifference to constitutional rights." *Harris*, 489 U.S. at 390 n. 10 (internal quotation marks omitted); *Bryan County*, 520 U.S. at 410 (stating that the key question is whether the defendant "disregarded a known or obvious consequence" of their actions).

The Seventh Circuit outlined such an obvious risk in *Glisson*. Glisson suffered from severe, cancer-related disabilities, which were "apparent at a glance." 849 F.3d at 375. During his trial and prior to his incarceration with the Indiana Department of Corrections ("INDOC"), experts testified that it was highly unlikely that Glisson could survive without specific care. *Id.* Specifically, Glisson required a neck brace, suction machine, mirror, and light for necessary tracheostomies. *Id.* When Glisson was transferred from jail to the Reception Diagnostic Center, INDOC sent with him his mirror, light, and neck brace. *Id.* However, the plaintiff did not receive his neck brace, and no one at INDOC provided a replacement. *Id.*

During this time, Glisson was under the care of Corizon, a private health care provider contracting with INDOC to provide inmates with medical care. *See Glisson*, 849 F.3d at 375. Although multiple treatment providers saw Glisson, no one developed a treatment plan, reviewed his medical history, or followed up on his treatment for twenty-four days. *Id.* at 376. Corizon's treatment resembled a "blind man's description of the

elephant[,]" and despite the disjointed care Glisson did receive, his symptoms continued to worsen until he died. *Id.* at 375, 377.

The Seventh Circuit noted that no one person providing Glisson with treatment was deliberately indifferent to his constitutional rights. *See Glisson*, 849 F.3d at 375. Furthermore, at no point did the Seventh Circuit find that multiple inmates were treated similarly to Glisson. *See generally, id.* However, the Seventh Circuit nevertheless found that Corizon made a deliberate policy choice not to require the coordination of medical care within or across institutions for at least seven years. *Id.* at 379, 382.

In finding that Corizon made such a policy choice, the Seventh Circuit compared the situation in *Glisson* to that in *Harris*. 849 F.3d at 382. In *Harris*, the Supreme Court noted that it was a "moral certainty" that police officers would be required to arrest fleeing felons; the need to train officers on the use of deadly force was therefore so obvious that the failure to do so constituted deliberate indifference. 489 U.S. at 390 n.10. Similarly, in *Glisson*, the Seventh Circuit concluded that "[o]ne does not need to be an expert to know that complex, chronic illness requires comprehensive and coordinated care." 849 F.3d at 382. The need to establish protocols for patients with chronic illnesses was therefore as obvious as the need to train police officers on the use of deadly force. *Id.* From this obvious necessity and Corizon's inaction, the Seventh Circuit concluded that Corizon had actual knowledge of a widespread policy and custom violating the inmate's constitutional rights and that Corizon made a deliberate choice, from various alternative options, to do nothing to remedy that policy. *Id.* (citing *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012); *Harris*, 489 U.S. at 389).

Here, Plaintiff provides sufficient evidence such that a reasonable jury could conclude that Defendant Wexford adopted a policy or custom of inaction in the face of an obvious risk to his constitutional rights. Plaintiff's twenty-eight instances of personal experience over thirty months amounts to nearly one missed medication per month. The Court finds that a reasonable jury could find that this consistent failure to provide medication constitutes a widespread practice. Additionally, Defendant Scott's testimony that inmates complained "all the time" about missed medications, and Defendant Wexford's admission that medication errors were systemically underreported reinforce Plaintiff's claim. As in *Glisson*, the necessity of providing inmates with chronic illnesses with consistent medication is so obvious that the failure to take action despite numerous complaints may constitute a deliberate choice to do nothing.

     b.   <u>Whether the IDOC Director Defendants and Medical Director Defendants Adopted an Unconstitutional Policy or Custom in their Official Capacities</u>

The IDOC Director Defendants and Medial Director Defendants further state that they had no knowledge of any alleged unconstitutional policy or custom. (Doc. 198, p. 18). In response, Plaintiff claims that inmates transferred on writ to the NRC are provided a one-page note, which mandates the care those inmates are to receive. (Doc. 213, p. 85). However, all of this information is handwritten and stored in a file cabinet as Wexford does not provide electronic notes. *Id.* at p. 86. Parent facilities, such as Pinckneyville, do not provide the charts of inmates when such inmates are transferred on writs, and medical staff at one facility are not able to review medical records created at the other facility. *Id.*

The Seventh Circuit has consistently held that showing actual knowledge of specific constitutional violations is not necessary to succeed on a *Monell* claim when a plaintiff can show constructive knowledge predicated on the obviousness of a risk of constitutional violations. For instance, in *J.K.J.*, the Seventh Circuit found that the likelihood that male guards would sexually assault female inmates was an obvious risk in light of the absence of written policies regarding prevention and detection of sexual assault. 906 F.3d at 381. Similarly, in *Woodward v. Correctional Medical Services of Illinois, Inc.*, the Seventh Circuit found that the training on suicide prevention was so inadequate that the defendant was on notice that a constitutional violation was a highly predictable consequence of its failure to act. 368 F.3d 917, 929 (7th Cir. 2004)(internal citations omitted). Finally, *Glisson* builds upon this doctrine by relying on *Harris* to state that Corizon's failure to act despite the obvious need to provide comprehensive and consistent care to chronically ill inmates supported an inference of both actual knowledge of a risk and a deliberate choice to ignore that risk. 849 F.3d at 382. (citing *Harris*, 489 U.S. 390 at n.10).

Though the IDOC Director Defendants and the Medical Director Defendants may not have personally reviewed Plaintiff's grievances regarding his missed medications (*see* Doc. 198, p. 18), a reasonable jury could nevertheless find that the defendants had constructive knowledge of a widespread policy or custom contributing to Plaintiff's injury because the risk of such harm was obvious. *See Glisson*, 849 F.3d at 382. Whereas, in *Glisson*, Corizon failed to update its policies for caring for inmates with chronic illnesses as they were transferred between institutions for seven years, here, Plaintiff

points out that the policy regarding inmates transferred on writ was in place and practiced for more than twenty-four years. (Doc. 213, p. 86). Furthermore, in *Glisson*, the plaintiff declined to appeal the district court's decision to grant summary judgment in favor of the INDOC; the Seventh Circuit also noted that the INDOC had a list of written policies requiring that inmates with chronic illness be provided comprehensive and consistent care. 849 F.3d at 380. In contrast, here, the IDOC Director Defendants and Medical Director Defendants provide no evidence of such a policy. The absence of a policy to care for inmates with chronic illness, when the necessity of doing so is a "moral certainty," may support a reasonable jury in finding that the defendants had actual knowledge of a policy giving rise to constitutional violations. A reasonable jury could also find that such defendants nevertheless declined to take action, just as the Seventh Circuit in *Glisson* found that Corizon's failure to act in the face of an obvious necessity implied actual knowledge on its part of the potential for constitutional violations. Given the "moral certainty" of the need to provide inmates with chronic illnesses with consistent and comprehensive care, the necessity of requiring in Glisson that inmates be transferred with comprehensive medical notes and information is obvious.

But, as explained *supra*, Plaintiff cannot succeed on a suit against the IDOC Director Defendants or Medical Director Defendants in their official capacities for money damages. Section 1983 does not override a State's Eleventh Amendment immunity. *See Quern v. Jordan*, 440 U.S. 332, 350 (1979). States are therefore not considered a "person" as required for liability under the law, per the statutory text of 42 U.S.C. § 1983. *See Will*, 491 U.S. at 64. However, suits against state officials in their official capacity for injunctive

relief are not treated as suits against the State. *See Graham*, 473 U.S. at 167 n.4. A plaintiff may therefore sue state officials in their official capacity for injunctive relief without triggering the Eleventh Amendment's immunities, and in such cases, the state officials are considered "persons" under the text of 42 U.S.C. § 1983. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991). Therefore, to the extent that Plaintiff proceeds on this claim against those defendants in their official capacity, it can only be for injunctive relief. And, specifically, here, it can only be against Defendant Jeffreys.[9]

c. *Whether the IDOC Director Defendants and Medical Director Defendants Adopted an Unconstitutional Policy or Custom in their Individual Capacity*

Suits against State officials are considered to be "another way of pleading against the entity of whom" that official is an agent. *Graham*, 437 U.S. at 166. Under *Monell*, a municipality is liable for policies or customs which violate an individual's constitutional rights not as the employer of an individual actor who violated those rights, but as the entity responsible for permitting the custom to continue. *See Iskander*, 690 F.2d at 128. In contrast, suits against officials in their individual capacity impose liability on those officials for personal actions taken under the color of state law. *See Graham*, 437 U.S. at 166. Because the doctrine of *respondeat superior* does not facilitate a supervisor's liability under § 1983, a supervisor or employer cannot be held liable for the actions of their employees under that statute, even if those employees violate another's constitutional

---

[9]      Suits against state officials in their official capacity are considered suits against the State. *See Graham*, 473 U.S. at 167-168. Moreover, in suits for injunctive relief, the proper defendants are those which can effectuate the relief requested. *See Gonzalez v. Feinerman,* 663 F.3d 311, 315 (7th Cir. 2011). The Court therefore finds that keeping Defendant Baldwin and the Medical Director Defendants in the suit is redundant, and summary judgement is therefore granted on this issue for these defendants. *See Wallace v. Baldwin*, Case No. 3:18-cv-1513-NJR-MAB, 2019 WL 6036742, at *3 (Nov. 14, 2019).

rights under the color of state law. *See Shields*, 746 F.3d at 789. Accordingly, unlike suits against officials in their official capacity, an officer's individual liability under § 1983 in that officer's individual capacity must be predicated on a finding that the defendant caused the deprivation of constitutional rights at issue. *See Kelly v. Municipal Courts of Marion County*, 97 F.3d 902, 909 (7th Cir. 1996).

Although a plaintiff must show that an officer caused the violation at issue when bringing suit under *Monell* against an official in their individual capacity, that plaintiff need not show the official's "direct participation" in the deprivation. *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003), overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). Instead, demonstrating that the defendant "acquiesced in some demonstrable way" to cause the violation is sufficient. *Kelly*, 97 F.3d at 909. This standard is similar to deliberate indifference. *See Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). In order to succeed on a *Monell* claim against defendants in their individual capacity, a plaintiff must show both that the individual knew of the circumstances which would give rise to a violation of plaintiff's constitutional rights and that the defendant inferred from those circumstances that the plaintiff's rights would be violated. *See Palmer*, 327 F.3d at 594. This standard continues to apply to defendants sued in their individual capacities under *Monell* post-*Glisson*. *See Mohamed v. WestCare Illinois, Inc.*, No. 19-1310, 786 Fed. Appx. 60, 60-61 (7th Cir. Nov. 26, 2019)(citing *Minix*, 597 F.3d at 831); *Miranda v. County of Lake*, 900 F.3d 335, 344 (7th Cir. 2018); *McCann v. Ogle County, Illinois*, 909 F.3d 881, 885 (7th Cir. 2018).

Plaintiff relies on *Glisson* in order to establish that the IDOC Director Defendants and Medical Director Defendants had knowledge of a widespread policy or custom violating Plaintiff's Eighth Amendment right to medical treatment. (Doc. 213, p. 86). Specifically, Plaintiff states that the policy to provide inmates with only a handwritten health transfer summary "comes from either IDOC or Wexford," and that this policy has been in place for twenty-four years. *Id*. Though this evidence may establish an obvious risk sufficient for maintaining a genuine question as to the IDOC Director and Medical Director Defendants' liability when examined in light of the suit against those defendants in their official capacity, this evidence cannot support a claim against those defendants in their individual capacities. There is no evidence that the IDOC Director Defendants or Medical Director Defendants personally knew that Plaintiff received only a one-page summary or that these defendants knew of other protocols preventing Plaintiff from receiving consistent medical care. In fact, even Plaintiff admits that Wexford, rather than IDOC, may have implemented the policy. *Id*. Without evidence that the IDOC Director Defendants or the Medical Director Defendants had knowledge of the circumstances giving rise to the violation of Plaintiff's constitutional rights, or evidence that these defendants inferred the risk of such a violation, a reasonable jury could not find that the IDOC Director Defendants or Medical Director Defendants are liable for the policy or custom giving rise to Plaintiff's injury in their individual capacities. Therefore, the Court grants summary judgement on this count for the IDOC Director Defendants and Medical Director Defendants in their individual capacities only.

**IV.     Whether the Remaining Defendants are Protected by Qualified Immunity**

Government officials performing discretionary functions are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. 800, 817-818 (1982). Courts evaluate whether an official is entitled to qualified immunity by examining whether the officials violated the plaintiff's rights as demonstrated by the alleged facts, and whether the right allegedly violated was clearly established at the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 200 (2001), receded from by *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)(holding that application of the two-step *Saucier* test is discretionary).

The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the context of the events giving rise to the violation. *See Saucier*, 533 U.S. at 202. For instance, in *Saucier*, the plaintiff was arrested during a speech by the Vice President. *Id.* at 208. The plaintiff alleged that an officer's "gratuitously violent shove" during an arrest violated the Fourth Amendment; lower courts found the defendant was entitled to qualified immunity on that claim. *Id*. The Supreme Court agreed, holding that, under the circumstances, a reasonable officer "hurrying" the plaintiff away from the scene for the Vice President's security was an appropriate action within the contours of the Fourth Amendment. *Id.*

The defendants frame the underlying constitutional violations as a "layperson's failure to tell medical staff how to do its job." (Doc. 198, p. 33). However, the Court has

already rejected this framing of Plaintiff's complaint.  The alleged constitutional violation is that these defendants had knowledge that Plaintiff was not being properly cared for by medical staff and did not exercise the power of their office in order to, at least, investigate and/or rectify the situation. It is clearly established that failing to do so violates Plaintiff's Eighth Amendment rights.

CONCLUSION

For these reasons, the Court **GRANTS in part and DENIES in part** the motion for summary judgment by Defendants Baldwin, Jeffreys, Spiller, Lashbrook, Meeks, Dempsey, Shicker, and Brown. (Doc. 198). The Court also **GRANTS in part and DENIES in part** the motion for summary judgment by Defendants Wexford Health Sources, Inc., Scott, and Shah. (Doc. 193). Summary judgment is granted as to all claims against the defendants in their official capacity for monetary damages. Furthermore, summary judgment is granted in Count I on the issue of whether Defendant Shah provided Plaintiff with appropriate medical care regarding his hypertension. Finally, summary judgment is granted on Counts III and IV of Plaintiff's complaint. Defendant Blades is therefore **DISMISSED** from all claims. In Count I, Plaintiff may proceed on his claims against Defendants Spiller, Lashbrook, Brown, Scott and Shah regarding access to his medications and against Defendant Shah with respect to his claim regarding the specialized diet. Plaintiff may also proceed on Count II against Defendant Wexford Health Sources, Inc. and against Defendant Jeffreys in his official capacity only for injunctive relief.

IT IS SO ORDERED.

DATED:  March 29, 2021.

Digitally signed
by Judge Sison 2
Date: 2021.03.29
17:20:16 -05'00'

_____

**GILBERT C. SISON**
**United States Magistrate Judge**